Our next case is HOLLAND v. United States. I won't start the clock yet, I just want to ask both counsel, how many more WinStar cases do we have? Aren't we getting near the end? We're getting near the end. Is it about six? I'm sorry, what? Two and five? Five or six? In that range? Just curiosity. The time is now yours, Mr. Roberson. Please begin. May it please the Court, I'm going to reserve five minutes for rebuttal. Good. The government entered into a broad settlement agreement with the plaintiffs, a settlement agreement which had no express reservation of rights, bars claims in this case. Nonetheless, the plaintiffs brought their claims against the United States for a breach of contract. The Supreme Court held in William Cramp, however, that for a plaintiff to preserve his rights, to litigate a claim following a settlement agreement, the settlement agreement must expressly reserve the right to maintain future litigation. This Court's decision 2009 in Bell v. CI, its 2006 decision in Active, and its 1999 decision in Augustine Medical are just the latest examples of a long line of cases recognizing the need for express reservations. Illinois state law governs here. And in this case, Illinois state law governs as well with respect to the IPI. If you look at this in terms of having two defendants, and we go to the co-obligor context, then Illinois state law does govern. And in that case, Your Honor, Clark, Cherney, Porter, and Cormick all hold consistent with the common law that an unconditional release of one of two or more co-obligors affects a complete release, even if the second co-obligor was not named or identified in the release. Let me ask you, if we accept the Court of Claims' conclusions with respect to the bank board having made contractual promises to plaintiffs, is it your view that by integrating those forbearance letters into the assistance agreement, FISLA took on the liability of those obligations? Absolutely, Your Honor. And that's what the Supreme Court held in Winstar at 883 in the Winstar decision. Congress itself expressed a willingness to bear the cost at issue here when it authorized FISLIC to guarantee acquiring thrifts against loss that might occur as a result of a supervisory merger. And importantly, the Supreme Court cited 12 U.S.C. section 1729 F2, which is a provision which provides the corporation, the FISLIC, the power to guarantee this assistance. Anything other than that in terms of authority? In other words, even if the bank board made independent contractual promises in its letters, it would no longer be liable that its obligation was subsumed by the bank board? The integration clause, there's only one signatory to the FISLIC assistance agreement, which is the FISLIC. That integrates the FLUB, Federal Home and Bank Board, resolutions and letters. It doesn't integrate the FLUB as a party. So the FISLIC assistance agreement itself is only signed by one government entity, the FISLIC. My question is, yeah, I get that. But why does that relieve, how are we to know, what do we base the conclusion I think you're urging on us, that that relieved the board of all of its obligations? And that's just to relieve them of their obligations. The contract is with the government, with the United States. It wasn't that everyone else besides the FISLIC could ignore and could breach. In fact, Congress is the breacher. But the question is, who then has liability? The liability is the FISLIC. So you only have one signed contract with the FISLIC before FIREA, and after FIREA you have a settlement with FISLIC's successor in interest of any and all claims connected with the assistance agreements, known or unknown. So there's a perfect symmetry in terms of going from FISLIC to the FDIC and FIRF. But, you know, in WinSTAR they talk about there's a recognition that there are a series of agreements involving various contractual provisions. Doesn't that support their argument that this was an independent agreement? The court didn't find this was an independent agreement. The court found there was a single unified contract, which if you were to go to the notion that there were two government entities involved in the contract, you get in the same place. And the reason why is because there's no express reservation of rights. So if you were to go to the notion that there was a contract with the FLUB and the FISLIC, it was still a single unified contract, and the court recognized that this would be joint several liabilities. But if they're co-obligors, if we conclude that they're co-obligors, then why doesn't the third party beneficiary clause and the accord and satisfaction clause in the settlement agreement demonstrate that they've retained their rights? Because the United States is not a third party. Let's go to the third party beneficiary clause first. The United States is not a third party beneficiary of its agencies. The agencies are authorities of the United States. The United States is acting through its agencies. The United States is in privity of contract. In fact, if that weren't the case, the fact that the FISLIC... But the language in the accord and satisfaction speaks of parties. So you're suggesting the party that signed this was the FDIC. Acting as an agency and instrumentality of the United States. It is the United States acting through the FDIC, Your Honor. And that was the same case in the FISLIC assistance agreements. They were signed by the FISLIC acting as an agency and instrumentality of the United States. So the United States is acting through its agencies. There's but one unified United States. And with the United States not... So if the Department of Labor does something... I mean, you're suggesting, at least in the alternative, for some broad ruling that any government agency releases the entire government, including all of the government agencies. In this case, when you have... With regard to the assistance agreements, the United States, writ large, was released by... A release that was for any and all claims known and unknown connected with the assistance agreements. That's correct, Your Honor. And that's why, in this case, it all comes down to whether there's an express reservation of rights. There's not. A third-party beneficiary clause is... First, we talked about the notion that it's a... Well, it comes down to who's got the burden. Right, that's correct. And that's what the Supreme Court has said, that there must be... When there's a broad release like this, there must be an express reservation of rights. And this Court has held repeatedly that that's the case. And if you look at the third-party beneficiary claim clause, that's not an express reservation of rights. At most, that's just saying that it's an implied right, that if you're not going to benefit from it, then somehow you're not going to be able to be sued on it. And so it's an implied reservation of rights. This Court held in Johnson-Drake that there should be no exception to a broad release should be implied when the facts of a claim were known at the time of the release. So the third-party beneficiary clause can't do what the plaintiffs want it to do. Nor can the Accord and Satisfaction Clause, which discusses that it was a release of such party for each party's performance. The Clark case under Illinois law, the Supreme Court case in 1900, is directly on point. It gave an example of the settlement agreement, which was between one person and Mr. Clark. And then there was a co-obligor. The fact that Mr. Clark and the person, the woman, was named put no bearing on the fact of the implication of that as a matter of law on the co-obligor. So even if the flaw is a co-obligor, as opposed, then it's released through Illinois law through the co-obligate, through Clark, Turney, Porter, a long line of cases, McCormick. And what the Court discusses there is the extent of the release. If the release is broad, if there's no condition on the release, then it's going to be a complete release. And that goes to the notion that you can only have one complete release on a claim. Once you've obtained a complete release, you're not entitled to other compensation. Excuse me. But your argument depends on... I mean, the settlement agreement lists as a party, not the U.S. government. It lists the federal FDIC as manager of the Fislich Resolution Fund. Your result depends upon our reading of that to mean that consists of the U.S. government. It depends on what the Court of Trial Court found, which was the FDIC and FERC were acting as agencies and instrumentalities of the United States. A78-79, the Court recognized that. And when the agency is acting as the United States, the United States is released. And the Court understood that if the United States was released, once you get the release of the United States, you release the United States writ large. So we can attack this one of two ways. You can say there's two separate entities, in which case the Illinois law works. Or if you say it's the United States, you have that direct connection to the United States, to the FDIC and FERC. And once the United States is released, even the trial court recognized that the United States, its agencies are released. That's A90 and A151. The Court said if the release applied to the United States, it would apply, and this is quotations, their release to all its agencies. So if the United States was released, these agencies are acting as part of the United States. Mr. Robinson, if we don't agree with you, why doesn't the Cross Appeal have validity based on anchor savings, which is a newly decided case? Your Honor, anchor savings is inopposite to this case. Anchor involved the loss of an asset that the institution held at the time of the breach. We're talking here about the savings claim, about an asset that wasn't even potentially thought about as being acquired for years in the future. 1988, this isn't even coming to their attention in 1991. The key difference there is, if you're talking about what a free of breach has been held to imply, is that the loss of assets was made to improve the capital ratios. Well, why is there a significant difference between loss of profits from having to sell an asset and loss of profits from not being able to purchase an asset? The reason is for the purpose that you do that. When you're selling your assets, you're doing that to increase your capital ratios, which means you're not putting that capital back to use. You're not leveraging back up. You're shrinking to increase your capital levels. When you're not acquiring something, you can still take your assets and acquire something else or invest it in something else. And, in fact, that's what they did. They paid down their loan to A and B, and that gave them an immediate return on the interest on A and B. And, of course, then we know that the same shareholders became the winners on Saves Me in the actual world, and they're actually asking for a double recovery on Saves Me. Your Honor, I know I've gone past my time. I just want to briefly touch on the diminishing value claim. Debt fails because Dr. Murphy, their expert, failed to present a non-breach world. In Yankee Atomic, this court instructed that in order to accurately determine plaintiff's damages, a plaintiff must present a point of comparison between the breach world and the non-breach world. And here Dr. Murphy doesn't even try. His failure to do that is monumental. He said he didn't even look at any of the non-breach factors. One exception, interest rates, and only with regard to his chosen methodology, which was a preferred stock discount rate, and used that. So he absolutely ignored all of the non-breach factors. The other reason why the claim fails is because his methodology measures 13 months before the breach and 19 months after the breach. He takes no accommodation for when the breach occurred, and he admitted that he was unaware of what factors negatively affected the thrift prior to the breach. A-101-652. So for 13 months before the breach, he says, I don't know what happened during there. It may have affected the thrift negatively, but I didn't take that into consideration. I'll reserve my time here. Thank you, Mr. Roberson. Mr. Brookman. May it please the court, after more than a dozen years of discovery in motions practice and a six-week trial, the trial court got it right. The trial court got it right with the exception of one mistake of law, which gives rise to First Bank's cross-appeal and one which I'll address shortly. But first let me address the government's appeal, which depends on an argument that is contrary to more than 15 years of Woodstock precedent. That is, the government claims that the Federal Home Loan Bank Board was not a party to a contract and did not make regulatory capital promises to the thrift. Let's assume they were a party, but this contract, their obligation was subsumed in the assistance agreements, right? And so it does, if you look at the overall picture, it sure strikes some, I would think, as unusual when the plaintiffs completely settled their interest with the only government agency that had signed the assistance agreements and that you still claim to be entitled to damages for breach of the assistance agreement. Your Honor, I would take exception with the characterization that the Federal Home Loan Bank Board promises, the forbearance letters, the resolutions, were subsumed in the assistance agreement. The assistance agreement had an integration clause. That integration clause swept away prior writings. It said, this is the entire agreement of the parties. Right, and who signed the assistance agreement? Your Honor, the FSLIC signed the assistance agreement, but the assistance agreement provided that it did not sweep away bank board resolutions and bank board forbearance letters. Those are not swept away by the integration clause. Those remain valid and blind agreements. Well, swept away doesn't mean, nobody's arguing that those obligations disappeared. The question is whether or not they were incorporated in the assistance agreement, right? Well, I... And were they or weren't they? No, I don't think that they, I think incorporated is a shorthand way of describing it. I wasn't suggesting, and I don't think the government's suggesting, that when the assistance agreement was signed, the obligations included in those other contracts were voided, were invalid, right? I don't think the government suggested that. I'm not sure if the... The question is whether or not they were subsumed, incorporated, those obligations were themselves incorporated under the assistance agreement, which was only signed by the, by FSLIC. And, Your Honor, I take it the government's argument is that the promises in the forbearance letters and resolutions were somehow incorporated into the assistance agreement, but the bank board is not a party. And, Your Honor... Would FSLIC have the authority to bind the bank board? Your Honor, the bank board made both direct promises and then sometimes acted through... The answer is no, of course, isn't it? Correct. Well, the FSLIC did not have authority to bind the bank board on these kind of regulatory capital promises. Absolutely, Your Honor, that's the case. And so only the bank board could give these promises. It did so directly in the forbearance letters and resolutions. The Supreme Court in Winstar, this Court en banc in Winstar, held that the bank board was a contract party in the same circumstance as here, where there were SAAs or assistance agreements signed only by the FSLIC and bank board resolutions and forbearance letters... Well, explain to me, and this is just, you know... The bank board issues these resolutions because they're over FSLIC. They issue these resolutions which prove and authorize FSLIC to execute assistance agreements, right? Yes. So FSLIC was authorized by the bank board to enter into these assistance agreements, right? Is it your view that the obligations between what you view as the bank board and the banks were not incorporated into the assistance agreement? I think that the assistance agreement and FSLIC's role was to promise cash assistance that the bank board... But can you just answer, were they or were they not incorporated within the assistance agreement? I think they were both incorporated in the assistance agreement but also made separately in the resolutions, and the resolutions and the forbearance letters were not swept into the assistance agreement. They were deemed by the assistance agreement to be valid and bind to writings that are not swept away or negated by the assistance agreement. They were also not just incorporated... But how could, under your view of the world, how could FSLIC have the authority to make, to have the final say as to whether or not these separate agreements with respect to the bank board and the banks were valid? You've just acknowledged that that's what they did, right, in the assistance agreements. No. Well, I don't think they had the final say. I think that the parties agreed by contract that the binding agreements with both the bank board were not vitiated by an assistance agreement that otherwise replaced prior writings. That those... They were incorporated into the assistance agreement. Your Honor, I think that some of those promises are stated in the assistance agreement but the resolution and the forbearance letters, those documents are vital whether or not there's an assistance agreement. Obviously, there's a bunch of precedent here for that proposition. And by having an assistance agreement that can terminate early but the regulatory promises remain vital, that's also precedent in this Court. Well, how can the third... To get back to the main point, how can the Third Party Beneficiary Clause reserve plaintiff's rights if it doesn't expressly list anyone else? Your Honor, I think by expressly identifying the only party that is to be a beneficiary of the contract, that is an express resolution. Is the government a third party beneficiary? If the government were to benefit in the way that opposing counsel suggests today, they would be a third party beneficiary because they would be getting more than was bargained for in the settlement agreement, which was to release only the obligations of the FDIC as manager of the FISLIC Resolution Fund, not to release the obligations of the Bank Board, the OTS, and any other government agency. When the government wanted a settlement like that, it got it. In the Metropolitan Bank example from North Dakota we've cited, the parties released both the FDIC, the FISLIC Resolution Fund, as well as... But this is hardly the kind of intended benefit that gives rise to a third party beneficiary status, is it? I think if other government agencies were deemed to benefit from this release, that is exactly the kind of third party beneficiary. It is a third party who is benefiting from the settlement when not entitled to. The contract not only has the third party beneficiary, it says nobody else benefits, no one else is released. It also states very clearly on its face that the only parties to this agreement and the only party released is the FDIC as manager... But usually when in these reservation clauses the law has required an express by name listing in order for it to reserve rights. We certainly don't have that, do we? Well, Your Honor, there's not an express by name, but there is an express reservation and I think that is all the law has required. The law has required that there be a delineation of who is being released and who is not. We have that. The law has required that these contracts be interpreted according to the party's intent. The plain language shows the intent and effect and the circumstances support that. The circumstances here are that the government was settling executory payment promises. It did it multiple times with multiple institutions. In none of those cases did it try to settle with regulatory capital promises. Certainly here it did not do so. The RTC made a report to Congress itemizing what the payments were and how they were being attributed and how much money the government was saving by the settlement as compared to making the executory payments on an ongoing basis. It said we've saved $165,000. So clearly both the plain language and the circumstances that surround it demonstrate that this was a limited settlement and release of only the FDIC as manager of the FISLIC Resolution Fund. That was the entity that was responsible for the cash assistance payments. The cash assistance up front and the ongoing loan loss guarantees had nothing to do with the regulatory capital promises. On your cross-appeal, why isn't this case distinguishable from anchor savings? Your Honor, this case is materially identical to anchor savings and Neely for the reason that the lost opportunity to acquire an asset is, in the substance, identical to the lost opportunity of continuing to own an asset. It's not identical. You're saying it's analogous. Yes, Your Honor. Identical it isn't. I appreciate the distinction and I agree, but it is materially the same. And what anchored savings teaches and what Neely taught three or four decades ago is that when there is a real world example to follow, here we have it. We know exactly how the acquisition that would have been made. It's not theoretical. It was presented. It was attempted to be acquired by the first bank predecessor. It was not acquired only because of the lack of capital, because of the government breach, and we know exactly how that institution, that acquisition performed. We know that it would have done at least as well under the ownership of the first bank. How about the diminution of value and the expert's comparison? How fair did it compare? Yes, the expert did not compare. What the expert did was consider the value of the institution before the breach. He then looked at the performance of the institution before the breach. It exceeded its business plan targets. It was successful. The government was very supportive of it, and it exceeded the projections that the government itself made when it was investing in the institution. Then the breach came, and the expert also considered the macroeconomic factors. Interest rates were declining over the period of time, which was good news for this particular thrift and its operating plans. The stock owned by the government had an escalating dividend, which meant that the stock over time should have been worth more. At the time of the breach, it should have been worth more on its own terms than it was worth prior. So the expert considered those factors. The item that I see that is the big game changer in terms of the value of the stock is the government breach. The thrift has gone from healthy, profitable, to having to shrink, having to deviate from the business plan, and facing possible seizure. That, the expert said, is attributable to the breach. The court agreed, and the expert then said, I'll take the two government valuations done by the government with every incentive to get them right, sophisticated parties negotiating both a purchase and a sale, and that is certainly a reliable  of the damages at the time of the breach. Briefly, Your Honors, as the cross appeal, we have a thrift that was one of the best performing in the Midwest, perhaps in the country, but certainly in the Midwest. It was favored by the government regulators who came to that institution with potential acquisitions, said troubled institutions, you take them because you're good at it. The business plans from the outset approved by the government specified that there would be growth, including through acquisition. The business plans projected profits on the same order of magnitude as in the cross appeal. In fact, the government, when marketing the River Valley institutions at the outset, projected the potential for profits on the same order of magnitude as the cross appeal. We know that First Bank's predecessor, River Valley, wanted to acquire San Antonio Federal Savings Bank, tried to do so, was unable to do so only because of the breach. We know what that institution earned that would have been for the benefit of First Bank. Under Neely, under Anchor Savings, that should have been awarded. The court made one error of law, which was to say that he thought, the court thought, that these kind of lost profits damages had to be measured only at the time of breach, not at the time of trial, with the benefit of hindsight. That, as Neely and Anchor Savings showed, was incorrect. Thank you. Thank you, Mr. Bookman. Mr. Roberson, you have three and a half minutes left. Thank you, Your Honor. Addressing first the Anchor discussion, another distinction was that there was, finding in Anchor, that there was an equivocal valuation at the time that that asset was lost because it was on a fire sale. Here, there's an unequivocal value because there was an audited financial statement demonstrating what the value of that asset was at the time it was, at the time that the asset purchase was not, you know, pursued. So that's an important distinction because that was why the court was saying, well, we'll look at this ex post data to see really what this, the value of this really was. Whereas here, you have an audited financial statement that demonstrated the value. With the diminution of value, the record here is unambiguous. Dr. Murphy didn't consider non-breach factors. He didn't know when the breach occurred between an almost three-year period of time. He didn't examine other factors affecting the thrift during this period of time. Going back to liability, the distinction here is, and the focus really should remain on whether or not there's an express reservation of rights. There's not. If you look at some of the Verini cases, like Syntex, the court did find there was a broad release, but there was also an express reservation of rights. There's simply no express reservation of rights. The court understood that there was no express reservation of rights. At A116, the court recognized there was no express reservation of rights. And what the court is asking this court to do is to break from a well-established precedent and define that where a plaintiff contracts with two federal agencies in a single unified contract, a plaintiff executing a broad settlement with one of those agencies need not expressly reserve its rights to sue either the United States or a second agency. That would be a complete break from this court's precedent and with the Supreme Court's authority going all the way back to William Crimp. The plaintiff's side to a case metropolitan, there's no bearing on this case whatsoever. The reason why there were delineated parts of the agreement with agencies is because they were cut off immediately in the initial sense from the assistance agreement. So it wasn't a situation here where there was a broad integration clause incorporating the FLUB documents. The important thing to think about, too, on the savings reclaim is the plaintiff's mitigated. They mitigated by creating another corporation, WCHI, and the very same shareholders have earned the $45 million that they're asking this court to give them for the second time. They're suggesting that a plaintiff  but that's exactly what they do. They're asking the court to give them the $45 million that they did here. The testimony was clear that they didn't care where they were moving their capital. They were going to get the same value no matter what. It was wildly profitable for them, $45 million. And the diminishing value claim, there's no basis in the record for that. There's no contemporaneous evidence in the record that the value went down. All the evidence is that the value went up dramatically. And we don't have to look any further than the fact that they started at $9 million equity value, liquidation value in 1988. When they sold it, it was $37 million. In 1991, in March of 1991, it was $39 million liquidated value, Your Honor. Thank you, Mr. Ruleborsch. Mr. Bergman, you have a minute and 49 seconds. Thank you, Your Honor. I may not even use it all, but I do want to address this notion that somehow First Bank mitigated by the virtue that some of its share, some of its predecessor shareholders were able to form a new company and with others make the San Antonio Federal Savings Bank acquisition. The notion that that is mitigation by First Bank or its predecessor. These are independent corporate entities with their own claims that the government insisted bring those claims directly as a corporation, not through shareholders.  The corporation brought claims. The corporation was unable to mitigate. And the fact that some of its shareholders were able to participate in an acquisition does not mean that the corporation is unable to recover. The only relevance to this is that it demonstrates that in fact the San Antonio Federal Savings Bank would have been at least as profitable for First Bank and its predecessor, River Valley, as San Antonio Federal Savings Bank was on its own because it was similar management, managed in a similar fashion and certainly in a similar fashion to the way San Antonio Federal Savings Bank would have been operated had River Valley and First Bank been able to acquire it as it would have except for the breach. Thank you. All right. Thank you, Mr. Bergman.